# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 14, 2010 Session

## STATE OF TENNESSEE v. JEFFREY SCOTT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-07601     James M. Lammey, Jr., Judge**

---

**No. W2009-00707-CCA-R3-CD  - Filed June 14, 2011**

---

A Shelby County jury convicted the defendant, Jeffrey Scott, of second degree murder.  The trial court sentenced him as a Range I, violent offender to twenty-five years in the Tennessee Department of Correction.  On appeal, the defendant presents nine issues for our review: (1) whether the trial court erred by admitting evidence of prior bad acts that were relevant only to show propensity; (2) whether the trial court erred by admitting hearsay statements under the state of mind and excited utterance exceptions; (3) whether the trial court erred by admitting fifty color autopsy photographs; (4) whether the trial court erred by allowing improper lay opinion testimony; (5) whether the trial court erred by allowing testimony that was protected by the attorney-client privilege and that violated the defendant's right to confrontation; (6) whether the trial court erred by denying the defendant's motions for mistrial or to strike a witness's testimony; (7) whether the evidence was sufficient to sustain the conviction for second degree murder; (8) whether the sequential jury instructions precluded the jury from considering a conviction for voluntary manslaughter; and (9) whether the trial court misapplied enhancement and mitigation factors in sentencing.  Following our review of the record, the parties' briefs, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Leslie I. Ballin (at trial and on appeal), Blake D. Ballin (at trial and on appeal) and Richard S. Townley (on appeal) for the appellant, Jeffrey Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham, Karen Cook

and Steven Crossnoe, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Background

On October 11, 2007, a Shelby County grand jury indicted the defendant, Jeffrey Scott, for the first degree murder of Ashley Scott, his wife. He went to trial in January 2009.

*State's Proof.* Dr. Robert McGee[1] testified that he had been friends with the defendant for over twenty years. He knew the victim through the defendant. Dr. McGee testified that on November 23, 2006, he was a resident physician in Shelby County. He said that on that day, which was Thanksgiving Day, he received a call from the defendant during the afternoon. The defendant asked how he was and what he was doing the rest of the day. After Dr. McGee answered, the defendant asked if he could come to the Scotts' house to take a look at the victim because the defendant "had some concern about [her.]" Dr. McGee testified that the defendant's tone of voice had "an element of concern, but there was not an element of . . . urgency." The defendant told Dr. McGee that the victim was "'not waking up right - [she was] not acting right.'" Dr. McGee asked him if they had been drinking, and the defendant responded affirmatively. Dr. McGee said that the defendant asked him to come alone. After a discussion with his wife, who was in the car with him at the time of the defendant's call, Dr. McGee called the defendant back to get more information, and the defendant responded by repeating his request that Dr. McGee come over to the Scotts' house. In order to get to the Scotts' house faster, Dr. McGee took his family to his parents' house, let his wife take his car, and borrowed his parents' car. When he got to the Scotts' house, he met the defendant in the den. The defendant pointed Dr. McGee to their bedroom, where Dr. McGee found the victim lying on the floor next to the bed. He testified that the victim "was very bruised and beaten." Dr. McGee identified a photograph of the victim and testified that the photograph showed the condition in which he found her. He said that he asked the defendant what had happened, and the defendant responded that they had gotten into an argument. Dr. McGee checked the victim's pulse and told the defendant to call 911, which the defendant did. Dr. McGee said that the victim was dressed in a shirt and jeans.

On cross-examination, Dr. McGee agreed that he told the police that the victim had vomit coming from her mouth and nose when he saw her. He also told police that she was not wearing shoes, and her feet were bluish. He described her hands as being blue and white. Dr. McGee agreed that he told the police that the victim had a bruise on her right forehead

---

[1] Dr. McGee identified himself during his testimony as "Robert." However, the transcript also refers to him as "Roger." For purposes of this opinion, we will refer to him only as Dr. McGee.

and around her right eye. Dr. McGee testified that the post-mortem photograph that he had previously identified might show bruises that were not present when he saw the victim because the body goes through post-mortem changes. Dr. McGee further testified that the defendant appeared "very calm" and "very much in shock."

On re-direct examination, Dr. McGee said that he arrived at the Scotts' house forty-five minutes to an hour after speaking with the defendant. He said that he did not observe any injuries on the defendant.

Paula Hagood testified that she was a police radio dispatcher for the Memphis Police Department. She testified that on November 23, 2006, she took a 911 call from the defendant, which was recorded in the normal course of business. The state played the recording for the jury. Ms. Hagood testified that she notified her supervisor that "the call was very possibly a homicide" because she "knew someone was gravely injured [and it was her] responsibility to let [her supervisor] know of any high-priority calls."

Memphis Police Officer Sloan Liddell testified that he was the first to respond to the Scotts' house. Upon entering the bedroom, he observed a man giving the victim CPR. He testified that he perceived the situation as an emergency and shouted to the fire department personnel to hurry. Officer Liddell said that the victim "appeared to have been beaten about the head." Officer Liddell and his partner, Officer Elkins, spoke with the defendant, who told them that he and the victim had argued, and the argument turned into a physical altercation. After another officer related to Officer Liddell that the victim had more injuries than Officer Liddell had personally noticed, he detained the defendant in his police car.

On cross-examination, Officer Liddell agreed that the defendant told him that the subject of the argument with the victim was a text message that the defendant found on her phone.

Gary Kent Garmon testified that he was a firefighter-paramedic for the Memphis Fire Department. He said that he had worked for the fire department for thirteen years and had been in the Army for twenty-four years, twelve of which was as a medic. He stated that he served in Iraq from 2005 to 2006 where he treated patients with injuries from explosions, blunt trauma, and bullets. Mr. Garmon testified that he and his partner responded to the Scotts' house on November 23, 2006. He initially observed blunt trauma to the victim's head, and after someone removed her clothing, he also observed blunt trauma to her legs, chest, and back. Mr. Garmon stated that the victim had no pulse or blood pressure and was not breathing. He said the victim's pupils were dilated and non-responsive, which indicated to him that she suffered trauma to her head. He said that another indication of head trauma was the blood-colored vomit coming from the victim's mouth and nose. Mr. Garmon

testified that the victim had "racoon eyes which [is seen] when [one] get[s] hit in the face or head trauma" and "battle signs, which is a bruising behind the ears, which usually indicates head trauma." He further stated that he observed a bruise on her back that, to him, appeared to be a shoe print. Mr. Garmon testified that he and the EMT used a defibrillator to shock the victim four times and also administered various medications to start the victim's heart. When that was not successful, they continued CPR and intubated the victim. Mr. Garmon said that, in his experience, the injuries to the victim's lip were not caused by intubation. They ultimately transported the victim to the hospital.

On cross-examination, Mr. Garmon agreed that his report did not indicate bruising on the victim's chest, mouth, knees, lower legs, ankles, or feet.

On re-direct examination, Mr. Garmon testified that he might not document injuries that did not pertain "to the mechanism of saving [the patient's] life."

Chief Daniel Wakefield, the battalion chief of emergency medical services for the Memphis Fire Department, testified that in November 2006, he was the emergency medical services lieutenant for the northeast quadrant of Memphis. Chief Wakefield testified that he responded to 590 Wesley Woods Drive, the Scotts' home, after the dispatch office related that they were sending police to the scene, and he arrived two to three minutes after the ambulance. When he first saw the victim, the paramedic and EMT were treating her and had removed some of her clothing. He observed bruising to her head, face, flank, abdominal area, knees, and lower legs. Chief Wakefield testified that it "looked like the [victim] had been assaulted." He said that a half-moon-shaped bruise on the victim's flank indicated, to him, trauma caused by the toe of a shoe. He described another bruise as appearing "to be a bottom imprint of a shoe." Chief Wakefield explained that the paramedic and EMT attempted to resuscitate the victim and that they transported her to the hospital because their monitor showed that she had some pulseless electrical activity, indicating a possibility that they could revive her.

Memphis Police Officer Stan Elkins testified that he arrived at the Scotts' home after Officer Liddell and before the ambulance. He said that the victim was "lying on the floor, and it appeared she had been beaten up." Officer Elkins spoke with the defendant, who told him that he and the victim had been drinking the night before, they had argued, and the victim had been in the garage from 1:00 a.m. until 9:00 a.m., when he brought her into the bedroom. Officer Elkins arrested the defendant and wrote a domestic assault report.

On cross-examination, Officer Elkins agreed that he smelled alcohol on the defendant's breath. The defendant told him that the victim passed out around 1:00 a.m. and slept in the garage. The defendant further told him that he moved the victim from the garage

-4-

into the den at 9:00 a.m. and from the den to the bedroom at 12:00 p.m. The defendant reported that the victim had been "breathing fine" throughout the day.

Memphis Police Sergeant Robert Edwards testified that he was working felony response on November 23, 2006, and responded to a suspected aggravated assault at 590 Wesley Woods Drive. He spoke with the defendant, who was sitting in a patrol car, and the defendant reported that he and the victim had gotten into an argument over a text message from a male on the victim's phone, which turned into a physical altercation. The defendant did not believe that he had injured the victim. The defendant said that he gave the victim a pillow and blanket and made her sleep in the garage. He eventually brought her inside and placed her in front of the fireplace. The defendant stated that he tried to put her into their bed but was unable to do so. Sergeant Edwards said that he had the defendant transported to 201 Poplar Avenue after interviewing him and Dr. McGee. He testified that he saw the victim's cell phone, which had been tagged as evidence, inside the residence, and he left it for the crime scene unit to collect. Sergeant Edwards stated that he did not see any injuries on the defendant, and the defendant turned down medical treatment.

Michelle Ann Bowe, an emergency room nurse at Baptist Memorial Hospital - Memphis ("BMH-Memphis"), testified that the victim was in critical condition when she arrived at the emergency room. The victim had a faint pulse and minimal blood pressure, so the hospital staff gave her medications to increase her blood pressure. Ms. Bowe testified that the victim had bruising around both of her eyes and multiple bruises in other locations. Ms. Bowe identified pictures of the victim and testified that they accurately depicted the victim's appearance.

Dr. Miguel Rodriguez, an emergency room physician at BMH-Memphis, testified that he treated the victim on November 23, 2006. He said that she was not breathing on her own and had bruising throughout her body. Dr. Rodriguez recalled a large bruise on her right flank that "looked like a foot mark or a boot mark." He said that one of her ears was very swollen, and he described it as a cauliflower ear, typically seen on a person who has been struck multiple times in the ear. Dr. Rodriguez testified that intubation would not have caused the swelling of the victim's lips. He said that based on his training in recognizing child abuse, the victim's extensive bruising "raise[d] the suspicion that there [was] some pattern of abuse here, and she had clear evidence that [there] was potential abuse here." Dr. Rodriguez testified that the victim's fixed pupils indicated that she was either comatose or semi-comatose and that she might have had a brain injury. He said that a CAT scan indicated that the victim had severe swelling of the brain with a shifting of the brain.

On cross-examination, Dr. Rodriguez testified that his report from November 23, 2006, indicated that the CAT scan showed a "subdural hematoma along the right side with a mid-line shift and massive cerebral edema."

On re-direct examination, Dr. Rodriguez testified that the victim's blood tests revealed that she had "an extensive amount of muscle cell breakdown." He said that her alcohol level was "132" at 5:00 p.m. He explained that normal on the scale would be less than ten while "[g]reater than 50 would be considered toxic, and greater than 400 [would be] fatal." He testified that the victim's blood glucose level was elevated, which he opined could have been caused by the body's release of glucose during a stressful situation, undiagnosed diabetes, or having had a meal that was high in carbohydrates.

Dr. Michael Smith, a pulmonary and critical care physician at BMH-Memphis, testified that Dr. Rodriguez called him to help with the victim's treatment. He recalled that his initial impression was that the victim "[l]ooked like someone that had been beaten to death." He testified that the victim had bruising on "[b]oth legs, knees, stomach[,] her back, her face, her ear, her head, [and] both arms." Regarding the bruise depicted in the state's exhibit 7, Dr. Smith said that the bruise "appear[ed] to be a boot print." Dr. Smith testified that lividity was setting in but would not have caused the victim's bruising. He said that his report stated that the victim's bruises "appear[ed] to be in different stages of age," but he explained that the use of bruise coloration to age bruises was controversial and that bruise coloration varied from person to person. He further testified that in consultation with Dr. Rodriguez as well as a neurosurgeon, they reached the conclusion that the victim was brain dead and that massive head trauma caused the brain death. Dr. Smith testified that the victim's alcohol level when at the hospital was 132, and he opined that the alcohol level did not cause her death.

Special Agent Linda Littlejohn, a forensic scientist at the Tennessee Bureau of Investigation Crime Laboratory's micro-analysis section, testified that the Memphis Police Department sent her three pairs of shoes and a disk containing photographs of the victim's injuries so that she could attempt to compare the shoe patterns to the injury patterns. Agent Littlejohn visually compared the shoe treads to the pattern of the injury and concluded that the three pairs of shoes were inconsistent with the injury. She said that the injury pattern could have been a shoe print but she could not state that conclusion with certainty because she did not have a matching shoe.

Dr. Jonathan Bradley Stern, an obstetrician and gynecologist, testified that the victim was his patient in 2006. He said that she was on a medication to increase her chances of ovulating. Dr. Stern saw the victim on November 14, 2006, and gave her a full physical at that time. He testified that she did not have any bruises.

Theresa Gayle Smith testified that she worked for Dr. Stern. She saw the victim on November 22, 2006, when the victim went to Dr. Stern's office for a blood test. Ms. Smith testified that she did not notice any bruising on the victim at that time.

Lisa Harris, a realtor, testified that she assisted the defendant and the victim in the sale of their home at 590 Wesley Woods Drive and in the purchase of another home. She further testified that they signed a contract on the new home on November 14, 2006, and the contract became effective on November 17.

Memphis Police Officer Patricia Kay Turnmire, with the crime scene unit, responded to 590 Wesley Woods Drive on November 23, 2006, along with Officer Allen Pounds. She testified that she photographed the garage, where a Jeep and a Volkswagen were parked. Officer Turnmire said that the trunk of the Volkswagen contained clothes, some of which were on hangers. She testified that a pet cage was in the garage and that it appeared that someone had moved it because there was an indentation on the wall where the cage had been. Officer Turnmire photographed and took samples of stains on the garage floor that appeared to be body fluids or blood. She said that a broken vase and dried flower arrangement were in a garbage can in the garage.

Officer Turnmire further testified that she did a walkthrough of the house on November 23 and observed a purse, cell phone, the defendant's passport, and a wine bottle on the kitchen counter. She said that there was a vase and dried flower arrangement on the fireplace mantle that matched the broken vase found in the garage. Officer Turnmire observed a house shoe and a pillow next to the fireplace, as well as particles that appeared to be part of the broken vase. She testified that a printed e-mail addressed to the victim was on the desk in the home's office, and the state published the e-mail to the jury. Officer Turnmire said that there was some type of fluid on the floor of the master bedroom. She collected a towel from the bedroom floor that appeared to have the same type of fluid on it as the bedroom floor and the garage floor. The parties stipulated that the crime laboratory was unable to complete testing of the collected fluid samples by the time of trial.

Investigator Thomas Helldorfer testified that he was retired from the Memphis Police Department and had been the case coordinator for this investigation. Investigator Helldorfer recalled seeing the defendant's passport at 590 Wesley Woods Drive, on the kitchen counter next to the refrigerator, on November 25, 2006. Someone from the defense counsel's office brought the defendant's passport to Investigator Helldorfer on January 29, 2007. He further recalled seeing a laptop at the house, which belonged to the school where the victim taught, but when he attempted to collect it at a later point in time, the laptop "turned up missing." Investigator Helldorfer testified that he collected a DNA sample from the defendant. He said

that when he collected the sample, he told the defendant that they could not discuss the case but could talk about something else, such as the weather. The defendant asked what day it was, and upon being informed that it was Tuesday, he asked who had won the Monday Night Football game.

Memphis Police Sergeant William D. Merritt testified that on November 24, 2006, he photographed the defendant for purposes of documenting what, if any, injuries he had. Sergeant Merritt said that he did not see any injuries on the defendant.

Paul Dooley testified that he worked with the victim at Bolton High School. He described himself as her department chair, mentor, and friend. He said that her classroom was across the hall from his. Mr. Dooley recalled that the victim received a DUI conviction in August 2005, and she began to complain of verbal and emotional abuse at home after that. He said that on one occasion in November 2005, the victim called him at 6:00 a.m. to tell him that she would not make it to school because she and the defendant had been fighting. He stated that she sounded very upset. Mr. Dooley recalled another incident on July 29, 2006, when the victim called him at 3:15 a.m. and said that the defendant had hit her and strangled her. He described her as being panicky.

Elizabeth Scism testified that she and the victim became friends when the victim was her student teacher in 2003. Ms. Scism said that she and the victim remained friends after the victim's student teaching period was over, and they kept in touch through e-mails and instant messaging as well as seeing each other in person. Ms. Scism testified that the victim called her soon after Thanksgiving in 2005. She said that the victim called from Blair Brown's house and spoke very fast. Ms. Scism testified that the victim

> told [her] she refused to go to Thanksgiving dinner; that she and [the defendant] were not getting along. She proceeded to tell [her] that he tried to choke her, and then she went on to talk about some sex life - that [the defendant] was into porn; that [the defendant] refused to kiss her; that she would ask him to kiss her, and he wouldn't do it.

Ms. Scism further testified that the victim called her in January 2006 and asked Ms. Scism to cover for her because she had checked into a hotel but had told the defendant that she was at Ms. Scism's house. Ms. Scism said that the victim told her in "numerous conversations" that the defendant called her "lots of bad names [and] insulted her in other ways." Ms. Scism stated that the victim told her that the defendant said she was not a good teacher and would not be a good mother. She said that the victim was "depressed, hurt, [and] frustrated" when she related what the defendant said.

-8-

On cross-examination, Ms. Scism admitted that she had been concerned about the victim's drinking because the victim had been in an accident and received a DUI conviction. Additionally, she agreed that the victim had told her that she did not go a day without getting drunk and never remembered going to bed. Ms. Scism further agreed that when the victim asked Ms. Scism to cover for her, the victim told her that she went to the hotel with "bad intentions" but "decided against it" when she got there.

Virginia Blair Brown testified that she met the defendant when she began working for his father's company in March 2000. She said that she had a sexual relationship with the defendant "off and on" from December 2002 until the middle of 2005. Ms. Brown testified that she knew the victim through the defendant and became "good friends" with the victim. She stated that the defendant told the victim about his relationship with her after their relationship ended. Ms. Brown testified that the victim came to her house more than once because the victim had a fight with the defendant "and she wanted to get away." On one occasion in November 2005, the victim went to Ms. Brown's house and was lying on the bed in Ms. Brown's bedroom when the defendant arrived. Ms. Brown testified that the defendant "had been drinking" and "was in a rage." She said that he "punched her in the back about . . . three times real [sic] fast." She recalled that she got him away from the victim and made him leave her house, but when she asked the victim about calling the police, the victim told her not to call them.

Ms. Brown testified that she was with the victim when the victim met Mr. Lowe, and she knew that the victim had an affair with him. She further testified that in late October or early November 2005, on one occasion when the victim went to Ms. Brown's house, the defendant called Ms. Brown and told her that he had learned about the affair when he saw text messages between the victim and Mr. Lowe on the victim's cell phone. She recalled that the victim spoke about leaving the defendant in 2005 but did not recall the defendant ever saying that he considered leaving the victim.

Ms. Brown said that she last saw the victim on November 22, 2006, when they went together to see the house that the victim and the defendant had bought. She testified that after they saw the new house, they went to the Scotts' current house, and she stayed with the victim until the defendant arrived, at which time she left.

On cross-examination, Ms. Brown testified that at some point during the victim's affair with Mr. Lowe, the victim and Mr. Lowe were together in Ms. Brown's guest bedroom, and Ms. Brown called the defendant and told him to come to her house because she wanted him to catch the victim. She explained that she felt that the victim was using her, and she was frustrated.

Ms. Brown testified that on another occasion, she and the victim were at a bar, and the victim began speaking with a man there. The victim did not want to leave with Ms. Brown and said she would get a ride from the man. Ms. Brown testified that she called the defendant and told him what the victim was doing, but she said she did not know whether the defendant found the victim with the man.

Ms. Brown recalled the victim being "in a rage," yelling at her on more than one occasion, but she did not remember the victim ever being "in a rage" directed at the defendant. She said that she was aware that the victim and defendant "were going to a counselor to try to work things out."

Ms. Brown testified that she and the victim went to a concert in the fall of 2005. They both were drinking, and the victim fell down. Ms. Brown said that she did not remember the victim hitting her head but she "remember[ed] a knot being caused from it."

Ms. Brown recalled an incident involving the victim's dog, when the defendant took the dog for a ride in his Jeep. She said the dog was hurt somehow, but she did not know exactly what happened. She met the victim and the defendant at the veterinarian's office, and the victim and defendant were yelling at each other.

Regarding November 22, 2006, Ms. Brown recalled that the victim had several glasses of wine at lunch and was in a good mood. She said that the victim was excited about the new house and the possibility of having a child with the defendant.

Lori Machen testified that she and the victim met when they were in fifth grade in Bossier City, Louisiana. They were best friends until the victim died. She and the victim kept in touch by telephone and occasional visits. Ms. Machen knew the defendant through the victim. She testified that she began getting phone calls from the defendant in November 2005. He called once every week or every other week for a month and a half to two months. He told her that the victim "was drinking a lot; that she was falling down; getting hurt; waking up the next morning and not remembering it happening." The defendant said that the victim was spending time with Ms. Brown and that Ms. Brown was a bad influence on her. In one conversation, the defendant told Ms. Machen "that he wanted to have children but that he did not want [the victim] to be the mother of his children." He also "called to tell [her] about the affair [the victim] was having [and] that he thought that he deserved better than [the victim]."

Ms. Machen testified that during the time period that the defendant was calling her, she called the victim, but the victim would not return her calls. She said that she encouraged the defendant to see a counselor because she "was always going to [be] biased toward [the

-10-

victim] because she was [her] best friend." The last time that the defendant called her, he told her "that the counselor had advised him to leave [Ms. Machen] out of it," and he would not call her again. After that phone call, she began communicating with the victim again.

Ms. Machen testified that she saw the victim in September 2006, when the victim stayed at her house in Louisiana and they attended their ten year high school reunion. The defendant did not go with the victim to her reunion. Ms. Machen said that when she tried to discuss the victim's marriage, the victim told her that she was having a good time and did not want to talk about it. According to Ms. Machen, the defendant called the victim "constantly" while the victim was in Louisiana. Ms. Machen said that the last time she talked to the victim was in November 2006, but she could not recall the exact date. She had a missed call from the victim on her cell phone at either 10:42 or 10:43 on November 22, 2006, but the victim did not leave a message.

Michael Lowe testified that he "met [the victim] out one night" in the fall of 2005. He said that they stopped having an intimate relationship in the spring or summer of 2006 but remained friends until the victim died. He said that they communicated mostly through text messages. Mr. Lowe did not recall sending her any text messages on November 22 or 23, 2006, nor did he remember receiving any text messages from her on those days.

On cross-examination, Mr. Lowe testified that he and a friend were at the Fox and Hound, watching football, when the victim and Ms. Brown sent drinks over to them. He and his friend joined them where they were sitting, and later that night he went to the victim's house with her. Mr. Lowe recalled seeing the defendant at Ms. Brown's house on the only occasion that he and the victim had sexual relations at Ms. Brown's house. He said that he did not remember the victim sending him pictures of herself. He agreed that their text message communications were sometimes sexual in nature.

On cross-examination, Mr. Lowe testified that he would have remembered it if the victim had sent him pictures of herself. He said that they had sex on four occasions, the last time being at Ms. Brown's house the day that he saw the defendant there.

Megan Tate testified that she had been the victim's student and teacher's assistant. She said that the victim was friendly and gave out her cell phone number to students. Ms. Tate said that on Thanksgiving Day, 2006, she sent a mass text message saying "Happy Thanksgiving" to two groups, one at midnight and one at 6:00 a.m. She said that the victim was in one of those two groups, but she could not recall which one. Ms. Tate stated that the victim did not respond. She said that on November 23, 2006, after she heard a rumor about the victim's death, she called the victim and left a voice mail.

-11-

Rachel Songstad testified that she was a divorce lawyer. She said that she met the victim in August 2005 after a mutual friend asked Ms. Songstad to refer the victim to a criminal lawyer who could represent her in her DUI case. She saw the victim at Bolton High School in September 2005, and she told the victim that she was a divorce attorney. The victim responded by asking Ms. Songstad for advice about a friend who was being abused.

Ms. Songstad again saw the victim in October 2005, at which time she observed a knot on the right side of the victim's head, and the victim again asked about her friend's situation. Ms. Songstad testified that she asked the victim whether she, and not a friend, was the one being abused, and she told the victim that if she hired Ms. Songstad as her attorney, that attorney-client privilege would protect their conversations. The victim said that she could not afford to hire her, so Ms. Songstad told her that a dollar would be enough consideration. The victim gave her four quarters. Ms. Songstad testified that she considered herself retained at that point. She said that she asked the victim whether her husband had given her the knot on her head, and the victim responded affirmatively. Ms. Songstad advised her to leave the defendant and gave her several options of what she could do. The victim replied that "[the defendant] told [her] that if [she] ever tried to leave him, he would kill [her]." The victim told Ms. Songstad that the defendant had been hitting her since college.

Ms. Songstad testified that she saw the victim with a black eye in October 2005, and the victim said that the defendant had hit her in the eye. She met with the victim in April 2006 at Bolton High School, and the victim told her that the defendant had "drug her all through the house [and] she said she had marks all over her back." Ms. Songstad explained that the victim never called her from her cell phone because the defendant checked her phone for numbers he did not know. Ms. Songstad testified that in July 2006, the victim called her from a phone at a tanning salon, and Ms. Songstad met her in the parking lot of the tanning salon. The victim told her that the defendant "had knocked her down; and when he kicked her, she fell into a piece of furniture and busted her chin open." Ms. Songstad said that the victim had a bandage on her chin because she had gone to a minor emergency center for treatment.

In September 2006, the victim called Ms. Songstad after she returned from her high school reunion. Ms. Songstad met with the victim at Bolton High School, and the victim told her that when she returned home, she noticed pictures turned around and things out of place. The victim said that she confronted the defendant about that, and he admitted that a prostitute had been in the house while she was gone. The victim further told her that the defendant went through her luggage and told her that she had dressed "like a whore" while she was gone. The victim told Ms. Songstad that she replied "to the effect of, 'Well, if I dressed like a whore, maybe you would be with me instead of having prostitutes in the house.'" The

victim said that the defendant knocked her down and put his foot on her chest, "kind of on her throat," and she told him to stop because she could not breathe. She said he told her he did not want her to breathe.

Ms. Songstad testified that she and the victim discussed divorce on several occasions. She said that the victim called her on November 22, 2006, and told her that she had her filing fee money ready and wanted to file for divorce. Ms. Songstad told her that she could not meet with her right away because she was in Nashville. She advised the victim to "[j]ust get out of there," and she would talk to her Sunday when she returned to Memphis. The victim replied that she would get out, but "she just had to get some things from the house." The victim asked Ms. Songstad whether she should tell the defendant that she was going to file for divorce, but Ms. Songstad advised her not to tell. Ms. Songstad testified that the victim responded that "she at least owed [the defendant] and his family an explanation as to why she was leaving." She said that she found out that the victim was dead on November 23.

Erica Dorris, a sales support manager at AT&T, testified concerning cell phone records for an account associated with a number ending in 1009. The records listed the defendant as the billing party and user. She testified that the account was "unsuspended" on October 6, 2005, but she said that the records did not indicate when or why the defendant suspended the account. Ms. Dorris testified that the records showed two phone calls from the phone to the phone's voice mail number on November 23, 2006, one at 10:51 a.m. and the second at 12:09 p.m.

On cross-examination, Ms. Dorris testified that the contact e-mail for the account was the victim's e-mail address. She testified that the report indicated that from October 29, 2006, until November 22, 2006, almost all of the text messages were either sent to or received from Mr. Lowe. She agreed that of the twenty-eight multi-media messages sent in the same time frame, all but two were sent to Mr. Lowe. On November 22, 2006, five multi-media messages were sent to Mr. Lowe.

On re-direct examination, Ms. Dorris said that AT&T was unable to determine the contents of multi-media messages.

Shelby County Sheriff's Office Deputy Steve Bierbrodt testified as an expert in the forensic analysis of cell phones. In the victim's phone, he found five pictures of female genitalia that had been sent via multi-media messaging to Mr. Lowe's number. Deputy Bierbrodt testified that the pictures could have been taken by the phone or downloaded from another source. He further testified that he was unable to determine when the messages were sent.

On cross-examination, Deputy Bierbrodt agreed that the sex toy pictured in some of the pictures on the victim's phone looked the same as a sex toy found in a drawer in the Scotts' bedroom.

Dr. Lisa Funte, assistant medical examiner in Shelby County, testified that the victim died from blunt-force injuries, including

Bilateral subdural hemorrhage.
Subarachnoid hemorrhage.
Intraparenchymal hemorrhage of the pons.
[Uncal] herniation in the right temporal lobe.
Subgaleal hemorrhage[.]
[H]emorrhage in the left temporalis muscle.
Abrasions and contusions of the face and head.
Lacerations of the mucosal surface of the lower lip.
Abrasions and contusions of the torso and extremities.

Dr. Funte testified that the victim suffered multiple blows to the head, but she was unable to determine the exact number of blows. She explained that a blow or blows to the head shifted the brain inside the intracranial cavity to the point that the brain broke the vessels and veins leading into and out of the skull, and the veins and vessels bled into the brain, causing a subdural hematoma. The subdural hematoma expanded as the amount of blood increased, and it pushed down on the brain, compressing the vessels at the base of the brain. That compression prevented blood and the oxygen carried by blood from getting to the brain, causing death of the brain tissue. Dr. Funte testified that as the brainstem died, it disrupted the activity of the respiratory and cardiac centers, ultimately causing death.

Dr. Funte said that in the course of the autopsy, she did not "see any indication of any disease or disease process that would have led to [the victim's] death." She testified that either a blow or a fall could have caused the laceration on the victim's lip, and that either injury or a secondary cause, such as the fluids given to her by the hospital staff, might have caused the swelling of her lip. Dr. Funte stated that the victim had contusions on her left shoulder, left hand, torso, lower left leg, left knee, right elbow, right arm, right thigh, right leg, right foot, and flank. She opined that medical intervention caused the rectangular bruising on the victim's torso. Dr. Funte stated that some of the victim's contusions were consistent with falling, but "[t]he overall pattern and location of those contusions [were] inconsistent with falling; [they were] consistent with an assault." She testified that she ruled the victim's death a homicide.

Dr. Funte said that she sent vitreous fluid from the victim's eye to a laboratory for screening and learned that the alcohol level in the vitreous fluid was 0.113 grams per deciliter. She explained that the vitreous alcohol level was reflective of blood alcohol level but not exactly the same. Dr. Funte opined that the vitreous alcohol level could have caused impairment, including falling. She further stated that the alcohol level does not remain stable after death.

On cross-examination, Dr. Funte said that she saw three individual impacts in one image previously shown to the jury. She further said that, while the individual injuries were consistent with falling, "[i]t [was] unlikely that a person [would] get up and fall down as many times in as many directions as the overall picture of these injuries present[ed]." She agreed that the injury to the lip might have been an injury secondary to intubation.

*Defendant's Proof.* The defendant tendered, and the court qualified, Dr. O'Brian Cleary Smith as an expert in anatomic pathology, forensic pathology, clinical pathology, and advanced trauma life support. Dr. Smith testified that after reviewing the victim's medical records and autopsy report, he found "that there [was] a readily scientifically defensible alternative explanation to [the victim's] death," namely, alcoholic ketoacidosis. He opined that the cause of the victim's death was blunt-force trauma that occurred as a result of falling or having seizures caused by alcoholic ketoacidosis. Dr. Smith explained that alcoholic ketoacidosis was "a derangement of the body's metabolism based upon the abuse of alcohol" and affected the functions of the liver, pancreas, kidney, and other organs. He opined that alcoholic ketoacidosis explained the levels of potassium, glucose, and ketone found in the victim's blood, as well as the breaking down of her muscles. Dr. Smith said that alcoholic ketoacidosis and diabetic ketoacidosis were differentiated by the type of ketones produced by the liver, but common laboratory methods did not measure the type of ketone. He testified that the victim's blood clotting studies and the sub-therapeutic level of acetaminophen in her blood indicated to him that she "ha[d] a propensity to bleed excessively." Dr. Smith explained that even a small amount of acetaminophen would have been problematic for someone with a pre-existing liver disease.

Dr. Smith testified that he reviewed the victim's CT scan from the hospital and compared it to the autopsy report. He said that the hospital CT scan indicated one subdural hematoma on the right side of the brain, and the autopsy report indicated both a hematoma on the right side and a hematoma of equal size on the left side of the victim's brain. Dr. Smith opined that an artery that ruptured under pressure on the left side might have caused the hematoma on that side.

Dr. Smith opined that the victim's blood alcohol level between 12:30 a.m. and 1:00 a.m. on November 23, 2006, would have been 0.349, based upon her blood alcohol level at

the hospital and the average rate of alcohol metabolism. Dr. Smith further opined that the bruises on the victim's body, which he noted were mostly on "bony prominences," generally indicated a pattern of falling rather than assault. Dr. Smith said that he could not determine from photographs exactly what caused the injury pattern on the right side of the victim's head, but he opined that the dog kennel in the garage could have caused the pattern of intersecting lines when the victim was either pushed into the kennel or fell onto the kennel. Dr. Smith testified that the fact that the defendant did not have any injuries was significant because he "would have expected some bruises on the [defendant's] knuckles[,] . . . arm[,] or . . . elbow." Dr. Smith testified that sectioning the victim's bruises, which Dr. Funte did not do, would have helped determine the ages of the bruises, which in turn would have helped determine whether the victim suffered her injuries due to alcoholic ketoacidosis-induced seizures over a period of time or from a beating at one time. He further testified that he would have tested the subdural hematomas to determine the timeline of when they occurred. Dr. Smith said that the symptoms of having a subdural hematoma varied depending on how fast the hematoma accumulated: a person might faint, stumble, or have seizures. He testified that Dr. Funte assessed the number of blows by "looking at the bleeding spots on the skull," but he opined that a better method would have been to look at the victim's skin because the skin would have been "the best repository of any sort of transfer of injury or other materials there that may suggest the instrumentality" used. Regarding the bruise that previous witnesses believed was a shoe print, Dr. Smith agreed that the bruise was a pattern contusion, but because the victim was clothed, he opined that her clothing might have caused the pattern. Dr. Smith said that he would have taken sections of all of the victim's organs to look for damage that would only be apparent under a microscope. He concluded that the investigation was not complete enough for him to have ruled the victim's death a homicide.

*State's Rebuttal.* Dr. Karen Elizabeth Chancellor, the Chief Medical Examiner for Shelby County, testified as an expert in clinical pathology, anatomic pathology, forensic pathology, and neuropathology. Dr. Chancellor testified that after reviewing the victim's autopsy report, autopsy photographs, and medical records, she concurred with Dr. Funte's finding as to cause of death – blunt-force trauma to the head. Dr. Chancellor said that the "chain of events [that] led to [the victim's] death . . . started with blunt-force injuries to the head that led to the subdural hematoma, that led to the brain swelling and herniation, which led to the brainstem hemorrhage and caused her death." She opined that the laboratory results from the hospital were "all consistent with someone who has suffered a severe traumatic injury." Dr. Chancellor testified that she did not see any laboratory values that indicated that alcoholic ketoacidosis caused the victim's death. She said that hospital CT scans have proven to be inaccurate regarding the presence or absence of subdural hematomas, and autopsies were the most accurate method to determine whether a person had a subdural hematoma. Dr. Chancellor opined that estimating a blood alcohol level prior to

time of death would be difficult because the fluids administered at the hospital would have skewed the blood alcohol level taken at the hospital and because people metabolize alcohol at different rates. Dr. Chancellor stated that sectioning the victim's bruises to determine age would have been unnecessary because the autopsy clearly revealed the cause of death. She further stated that sectioning the victim's organs would only have been necessary if the medical examiner could not otherwise determine the cause of death.

Following the close of proof and deliberations, the jury returned a verdict finding the defendant guilty of the lesser-included charge of second degree murder. The trial court held a sentencing hearing and subsequently sentenced the defendant as a Range I, violent offender to twenty-five years in the Tennessee Department of Correction.

## II. Analysis

### A. Prior Bad Acts Testimony

The defendant contends that the trial court abused its discretion by admitting the testimony of Paul Dooley, Virginia Blair Brown, Elizabeth Scism, and Rachel Songstad. Specifically, the defendant argues that the trial court "utilized relations [between the defendant and the victim] as a general, independent ground for admission under [Tennessee] Rule [of Evidence] 404(b)," contrary to *State v. Gilley*, 173 S.W.3d 1 (Tenn. 2005), in which the supreme court ruled that its decision in *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993), "did not establish a per se rule allowing the admission of evidence of prior acts of physical abuse committed by a defendant against a victim." *Gilley*, 173 S.W.3d at 7. The defendant also argues that the trial court did not properly follow the procedure outlined in Rule 404(b) for each witness's testimony.

Pursuant to Tennessee Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts is generally not admissible "to prove the character of a person in order to show action in conformity with the character trait." The rationale underlying this rule is that the admission of such evidence carries with it the inherent risk of the jury convicting the accused of a particular crime based upon his bad character or propensity to commit the crime rather than the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the accused's other bad acts are similar to the crime for which the accused is on trial. *Id.*; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). Nonetheless, evidence of other crimes, wrongs or acts may be admissible where it is probative of a purpose other than the accused's propensity. Tenn. R. Evid. 404(b). Although Rule 404(b) does not explicitly list the exceptions under which evidence of prior crimes, wrongs, or acts may be admitted, our courts have held that such evidence may be admissible to show another purpose such as motive, intent, guilty knowledge, identity of the defendant, absence of mistake, or the existence of a common scheme. *See*, *e.g.*, *State v. Berry*, 141

S.W.3d 549, 582 (Tenn. 2004); *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975). To admit such evidence, Rule 404(b) specifies the following:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent an abuse of discretion. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

### 1. Failure to Follow Gilley

The defendant's first contention is that the trial court failed to follow the Tennessee Supreme Court's holding in *State v. Gilley*, 173 S.W.3d 1 (Tenn. 2005). In that case, brought before the court on interlocutory appeal, the supreme court ruled that the intermediate appellate court misinterpreted the supreme court's holding in *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993). *Gilley*, 173 S.W.3d at 1. The supreme court stated

> Notwithstanding the language in Rule 404(b), the Court of Criminal Appeals stated that evidence of prior physical abuse committed by a defendant against a victim is "seemingly per se admissible" under *State v. Smith*, 868 S.W.2d 561 (Tenn.1993). In *Smith*, evidence of prior violent acts committed by the defendant against the victims was admitted in the defendant's trial for first degree murder. On appeal, this Court observed that the evidence "was admitted not to prove the Defendant acted in accord with this character but as

-18-

part of the proof establishing his motive for the killings." *Id.* at 574. This Court also observed that the probative value of the evidence was not outweighed by the danger of unfair prejudice. *Id.*

Our decision in *Smith* did not establish a per se rule allowing the admission of evidence of prior acts of physical abuse committed by a defendant against a victim, nor did our decision abandon the requirement that such evidence must be relevant to a material issue at trial. To the contrary, we stated that the evidence was relevant to the defendant's motive. *Id.* at 574. Moreover, the evidence of motive was also circumstantial evidence of identity, which was a material issue at trial in light of the defendant's alibi defense. *See id.* at 568; *see also* Neil Cohen et al., *Tennessee Law of Evidence* § 4.04(9), p. 4–84 (4th ed. 2000) ("Although motive itself is rarely an issue in a case, it is often circumstantial proof of some other important matter, such as identity, intent, or lack of accident."). Given these principles, the Court of Criminal Appeals' broad interpretation of *Smith* was error.

Accordingly, because there is no per se rule of admissibility under Rule 404(b) for prior acts of abuse committed by a defendant against a victim, the trial court must, on remand, consider the admissibility of the State's proposed evidence by applying the specific safeguards set forth in Rule 404(b).

*Id.* at 7. The supreme court reversed the Court of Criminal Appeals' judgment and remanded to the trial court. *Id.*

When the case came before the Court of Criminal Appeals again on direct appeal, the panel concluded that the trial court did not abuse its discretion by admitting evidence of the defendant's prior violent acts, reasoning that the prior violent acts were probative of the defendant's intent, which was a material issue in the first degree murder case because the state was obliged to prove that the victim's killing was premeditated and intentional. *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008) ("*Gilley II*"). The supreme court denied the defendant's application for permission to appeal. *Id.* at 739.

The defendant's argument suggests that the supreme court's ruling overturned the line of cases stating that the relationship between the victim and the defendant could be relevant to show motive or intent. *See, e.g. Smith*, 868 S.W.2d at 574; *State v. Turnbill*, 640 S.W.2d 40, 46–47 (Tenn. Crim. App. 1982); *State v. Glebock*, 616 S.W.2d 897, 905–06 (Tenn. Crim. App. 1981). However, the supreme court's decision in *Gilley* corrected the Court of Criminal Appeals' overbroad interpretation of *Smith* without disturbing the rules pertaining to Rule 404(b) proof. *See Gilley*, 173 S.W.3d at 7. The defendant has not shown any evidence that

the trial court allowed proof of the relationship between the victim and the defendant under a general ground for admission, independent of the requirements of Rule 404(b). Rather, the record shows that the trial court substantially complied with the requirements of Rule 404(b) and did not apply the per se approach that the supreme court cautioned against in *Gilley*. In fact, if the defendant's argument that "[p]er se admissibility would remove the trial court's discretion to view the facts and circumstances of each prior bad act individually to make the best determination of admissibility" is correct, then the trial court's exclusion of much of the state's Rule 404(b) evidence demonstrates that the trial court individually determined admissibility and did not apply a per se rule that all of the defendant's alleged prior bad acts were admissible. We conclude, therefore, that the defendant's first argument is without merit.

### 2. 404(b) Witnesses

In this case, the trial court conducted lengthy jury-out hearings on each of the state's proposed 404(b) witnesses. The trial court characterized the witnesses' testimony as follows:

> Basically, there [are] several different types of witnesses. There are witnesses who observed odd or unusual behavior of the victim - saw some injuries but did not inquire as to the source of those injuries.

> And then we have people who had conversations with Ms. Scott regarding injuries. Some of them relayed that she was in an excited state when she said these things or had something that indicated what her state of mind might have been - what her future actions might have been, rather than the state of mind of the defendant. And some that were unclear.

> And then we have statements from people who witnessed an altercation between the victim and the defendant; and of course, we have the defendant's own statements about his relationship with the victim.

Prior to ruling on the admissibility of each witness's testimony, the trial court interpreted *State v. Glebock*, 616 S.W.2d 897 (Tenn. Crim. App. 1981),[2] to mean that the "relations existing between the victim and the defendant" were "relevant" but not "automatically admissible" and that "[t]hese relations indicate[d] hostility toward the victim and a settle[d] purpose to harm or injure the victim." The trial court ruled that parts of some witnesses' proffered testimonies were admissible and excluded the proffered testimonies of six of the state's proposed witnesses.

---

[2] A portion of the transcript refers to this case as *State v. Glaubach*.

Regarding the testimony of Paul Dooley, the court allowed parts of his testimony about the defendant's prior bad acts, as related to him by the victim, after finding (1) that clear and convincing evidence proved that the events occurred, (2) that the statements met the "excited utterance" exception to the hearsay rule, and (3) that the testimony was relevant to the material issues of "premeditation and intent" as proof of the defendant's settled purpose to harm the victim. The court excluded the parts of Mr. Dooley's testimony that related to general conversations with the victim and to injuries he observed on the victim for which there was an alternate explanation other than that the defendant caused the injury. The record shows that the trial court substantially complied with the procedure outlined in Rule 404(b), and, therefore, it is entitled to great deference. *See James*, 81 S.W.3d at 759.

The defendant contends that the trial court abused its discretion because, he argues, the acts about which Mr. Dooley testified were only relevant to show the defendant's propensity to commit the charged offense. However, as another panel of this court noted, "Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent." *Gilley*, 297 S.W.3d at 758. We cannot say that the trial court applied an incorrect legal standard or reached an illogical conclusion; therefore, we conclude that the trial court did not abuse its discretion in admitting Mr. Dooley's testimony.

The trial court found that Virginia Blair Brown's testimony was admissible under Rule 404(b). The court stated that it was "convinced, by clear and convincing evidence, that she saw what she saw and that she heard what she heard" and that the probative value was not outweighed by the danger of unfair prejudice. The court found that Ms. Brown's testimony was "relevant to a number of things - whether or not she intended on leaving him which could give a motive for committing an offense such as this - and intent as well." The court further ruled that the victim's statements to Ms. Brown were admissible under either the "state-of-mind" or "excited utterances" exceptions to the hearsay rule.

The defendant contends that the trial court did not comply with Rule 404(b) because it did not state the relevance of the proffered testimony to a material issue other than propensity. The record reveals that the trial court found that the testimony was relevant to both motive and intent; therefore, the defendant's argument is without merit. We conclude that the trial court did not abuse its discretion in admitting Ms. Brown's testimony.

The court additionally found Elizabeth Scism's testimony to be admissible under Rule 404(b). The court stated that the proof was clear and convincing, that the victim's statements to Ms. Scism were admissible as "excited utterances," and that Ms. Scism's testimony showed the relations between the victim and the defendant, which the court found were

relevant to prove premeditation and intent. The court further found that the probative value was not outweighed by the danger of unfair prejudice.

The defendant complains that the trial court "invoked intent and motive as material issues, but did not provide the necessary missing link that would show how the alleged prior bad act was relevant to show motive or intent." The defendant also argues that Ms. Scism's testimony that the defendant watched pornography and would not kiss the victim was not relevant to any material issue. However, the record shows that the trial court explicitly stated that the *entirety* of Ms. Scism's testimony ruled admissible under Rule 404(b) was relevant to show the relations between the victim and the defendant, which was relevant to prove premeditation and intent. As previously discussed, this type of evidence is an acceptable means of allowing the state to prove intent. *See Gilley II*, 297 S.W.3d at 758. Therefore, we conclude that the trial court did not abuse its discretion.

Regarding Rachel Songstad's testimony, the trial court found that it was relevant to "show the marital relationship . . . which is relevant to show premeditation and intent." The court also said that Ms. Songstad's testimony was relevant to show that the victim intended to leave the defendant. The court found that the victim's statements each met a hearsay exception, that the testimony proved the events in question by clear and convincing proof, and that the danger of unfair prejudice did not outweigh the probative value. The court excluded any testimony from Ms. Songstad that the victim was fearful of the defendant.

The defendant argues that (1) the state did not prove by clear and convincing evidence that the defendant committed the prior bad acts and (2) the court did not identify a material issue other than propensity. Regarding the first argument, the defendant contends that inconsistencies between Ms. Songstad's proffered testimony and her testimony in front of the jury, as well as inconsistencies between her testimony and the testimony of other witnesses, "undermined the credibility and reliability of Songstad's testimony."[3] However, the credibility of a witness is a matter for the fact-finder and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Therefore, the defendant's contention is without merit. As for his second issue, as with the other witnesses, the court did not abuse its discretion in allowing evidence of prior bad acts that showed the relationship between the defendant and the victim under the precedents of *Smith*, 868 S.W.2d at 574; *Turnbill*, 640 S.W.2d at 46–47; *Gilley II*, 297 S.W.3d at 758; and *Glebock*, 616 S.W.2d at 905–06.

---

[3] The state responds that the defendant waived this argument by not objecting on this ground at trial. However, we agree with the defendant's argument in his reply brief that the defense pre-trial motion in limine and his objection to all of Ms. Songstad's testimony was sufficient to preserve the issue for appeal. *See State v. McGhee*, 746 S.W.2d 460, 463-64 (Tenn. 1988).

-22-

*B. Hearsay Statements*

The defendant argues that the trial court erred in ruling that statements by the victim to Paul Dooley, Elizabeth Scism, and Rachel Songstad were admissible either under the "state-of-mind" hearsay exception or the "excited utterance" hearsay exception.

The admission of evidence is a matter left to the discretion of the trial court, and the trial court's decision will not be disturbed on appeal absent an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it falls under one of the enumerated exceptions to the hearsay rule. *See* Tenn. R. Evid. 802. Those exceptions are defined under Tennessee Rules of Evidence 803 and 804 and include exceptions for "excited utterances" and statements of a declarant's then-existing state of mind.

*1. Excited Utterances*

Tennessee Rule of Evidence 803(2) defines an "excited utterance" as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rationale for admitting an "excited utterance" is that the perceived event produces nervous excitement, which temporarily suspends the capacity to reflect, making the fabrication of statements about that event unlikely. *State v. Gordon*, 952 S.W.2d 817, 819 (Tenn. 1997) (citations omitted). In addition, a statement relating to a startling event is typically made while the memory of the circumstance or event is still fresh, thus creating a more accurate testimonial to the event than would be produced by a later in-court description of it. *Id.* at 819-20.

In order to meet the parameters of the "excited utterance" exception "(1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress or excitement of the event or condition." *Banks*, 271 S.W.3d at 116; *see also State v. Stout*, 46 S.W.3d 689, 699-700 (Tenn. 2001), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572 (Tenn. 2004); *Gordon*, 952 S.W.2d at 820. Relevant factors to the determination of whether a statement meets the "excited utterance" exception include the passage of time, whether the statement was made in response to a question, "the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such

-23-

characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress." *Gordon*, 952 S.W.2d at 820 (citations omitted).

The defendant argues that the trial court did not make explicit findings regarding the passage of time between an event occurring and the victim's statements to Paul Dooley, Elizabeth Scism, and Rachel Songstad, and therefore, the trial court could not make a determination as to whether the victim's statements were sufficiently connected in time to the events she described.[4] However, the time interval between a startling event and a statement is but one consideration in determining the statement's admissibility as an "excited utterance." *See Gordon*, 952 S.W.2d at 820. In *Banks*, the supreme court noted that "the evidence [did] not permit an exact determination of the length of the interval between [declarant] being shot and [the police officer] arriving on the scene." *Banks*, 271 S.W.3d at 117, n. 14.[5] Similarly, in this case, the evidence does not permit an exact determination of the passage of time. In fact, the only person who could have given evidence of the time interval was the victim. The defendant suggests, however, that hours or even days passed between the event and the victim's statements. In *Banks*, the supreme court, relying on the defendant's suggested time frame, ruled that the trial court did not err by admitting a statement made several hours after the event,[6] reasoning that "the 'length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance.'" *Banks*, 271 S.W.3d at 117 (quoting *Williams v. State*, No. W2006–00605–CCA–R3–PC, 2007 WL 2120174, at *7 (Tenn. Crim. App., at Jackson, July 24, 2007)). The court further reasoned that the time interval was "material only as a circumstance bearing on the issue of continuing stress." *Id.* (citation omitted). Following the supreme court's reasoning, in this case, the trial court did not abuse its discretion by relying on other factors to makes its admissibility ruling when it did not have evidence with which to make an exact determination of the passage of time. Therefore, we conclude that the defendant's argument is without merit.

The defendant also asserts that the trial court erred by "rel[ying] on evidence not introduced at trial" when admitting the victim's statements to Ms. Songstad in October 2005. The defendant states that the court found that the victim was crying during that encounter and

_____

[4] The state responds that the defendant waived this argument by not objecting on this ground at trial, but the defendant, in his reply brief, argues that his objections were sufficient to preserve the matter for appeal. We agree with the defendant. *See id.*

[5] For purposes of that opinion, the supreme court adopted the defendant's suggested time frame. *Banks*, 271 S.W.3d at 117, n. 14.

[6] The defendant suggested that four to six hours passed. *Id.* at 117.

subsequently found that the statement was an "excited utterance" despite the fact that Ms. Songstad did not testify that the victim was crying. Contrary to the defendant's assertion, however, the record reveals that the trial court admitted the October 2005 statement because the victim "was visibly trembling . . . [and] obviously in an excited state" and did not state that its decision was based on non-existent testimony of the victim's crying. Therefore, the defendant's argument has no merit.

### 2. State of Mind Exception

Tennessee Rule of Evidence 803(3) defines the "state of mind" hearsay exception as
[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

However, "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." *Id.*, Advisory Comm'n Cmts.; *see also State v. Hutchison*, 898 S.W.2d 161, 171 (Tenn. 1994).

The defendant contends that the trial court erred by admitting the victim's statements to Elizabeth Scism and Rachel Songstad through the "state of mind" hearsay exception. Regarding Ms. Scism's testimony, our close review of the record reveals that the trial court allowed parts of her proffered testimony under the "excited utterance" hearsay exception but excluded another portion of her testimony because it did not meet the "state of mind" hearsay exception. During the jury-out hearing, the court ruled that Ms. Scism's telephone conversation with the victim was admissible as an "excited utterance." Later, in a bench conference during Ms. Scism's testimony before the jury, the court ruled that a statement of the victim made in October 2006 did not meet the "state of mind" hearsay exception. Based on our close review of the record, we conclude that the trial court did not find Ms. Scism's testimony admissible under the "state of mind" hearsay exception; therefore, the defendant's argument is without merit.

The defendant also contends that the trial court erred by admitting the victim's statements to Ms. Songstad under the "state of mind" hearsay exception. The defendant says that the victim's statement to Ms. Songstad that the defendant told her that he would kill her if she left him did not meet the "state of mind" hearsay exception because, he argues, it was "'a statement of memory or belief to prove the fact remembered,' *i.e.*, that the Defendant made the threat." The record reveals that the state offered the statement to prove the victim's conduct of staying in the marriage, rather than as proof of the defendant's conduct and that the statement was relevant to show the state of the relationship between the victim and the

defendant; therefore, the statement met the "state of mind" exception. *See State v. Trusty*, 326 S.W.3d 582, 602-03 (Tenn. Crim. App. 2010) (holding that trial court did not err by admitting homicide victim's statements that she was afraid of the defendant, with whom she had a tumultuous romantic relationship). To the extent that the statement could be taken as proof of the defendant's future conduct, the trial court gave a limiting instruction regarding the use of Rule 404(b) evidence, which included this statement by the victim. We conclude that the trial court did not abuse its discretion by admitting the victim's statement through Ms. Songstad.

The defendant also argues that the victim's September 2006 statement to Ms. Songstad that she told the defendant when he was choking her that she could not breathe and that the defendant responded that he did not want her to breathe was inadmissible hearsay under either the "state of mind" hearsay exception or the "excited utterance" hearsay exception. We have already ruled that the statement met the criteria for the "excited utterance" exception; therefore, any error in admitting it under the additional basis of the "state of mind" exception is harmless. We conclude that the defendant is without relief for this issue.

### C. Post-Mortem Photographs

The defendant argues that the trial court erred by admitting fifty full color post-mortem photographs of the victim. He claims that the state sought their admission to inflame the passions of the jury. The defendant further claims that the photographs had little probative value for an issue in dispute, that the medical examiner's oral testimony was sufficient to describe the injuries, that the autopsy photographs were shocking in nature, and that the photographs were largely repetitive. Finally, the defendant asserts that the trial court erred in admitting Exhibits 2 and 6-13 because they were not properly authenticated.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *See State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998), *cert. denied*, 526 U.S. 1071 (1999); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *see also* Tenn. R. Evid. 401, 402. "[P]hotographs of [a] corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character." *Banks*, 564 S.W.2d at 950-51.

Nevertheless, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *See id.* Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *See Vann*, 976 S.W.2d at 102-03; *see also* Tenn.

R. Evid. 403 ("[A]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."). In this respect, photographs of murder victims are prejudicial by their very nature. However, prejudicial evidence is not excludable per se. If this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *See Banks*, 564 S.W.2d at 951. The *Banks* court defined several factors for the reviewing court to consider when determining the admissibility of post-mortem photographs:

> The matters to be taken into consideration include the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. If the inflammatory nature of the photograph is thus outweighed, it is admissible.

*Id.*

In this case, the trial court held an extensive jury-out hearing regarding the autopsy photographs prior to Dr. Funte's testimony. The state argued that the photographs were necessary to explain Dr. Funte's testimony and to respond to the expected testimony of the defendant's expert, Dr. Smith. The court excluded some of the photographs and ordered the state to crop other photographs so that the cropped portions would be "dehumanized." The court also cautioned the jury that "although [the photographs] may be disturbing," they were not to use the disturbing nature of the photographs "for sympathy or prejudice for or against either side" and were "not to allow that to reflect in [their] verdict."

After reviewing the photographs in question and the record as a whole, we cannot say that the trial court abused its discretion in admitting the photographs. Some of the photographs depicted bruises, and the cause of those bruises was clearly one issue in contention because the state attempted to show that the defendant caused the bruises and the defendant's expert provided an alternate explanation. The autopsy photographs of the victim's brain, skull, and scalp, while graphic, were relevant to Dr. Funte's testimony regarding the location, extent, and number of the victim's injuries. Despite the defendant's contention that the cause of death was not at issue, as both Dr. Funte and Dr. Smith testified that the victim died of blunt-force trauma, Dr. Funte testified that the victim received at least three blows to the head, while Dr. Smith opined that one injury could have caused the damage. Furthermore, Dr. Smith called Dr. Funte's methodology into question, and the

photographs were relevant to her explanation of her methodology. The defendant complains that the accuracy of the photographs was impaired because the defendant, fire department personnel, and hospital staff moved the victim and because of the length of time that passed between the victim's death and when the medical examiner's office took the photographs. However, the jury heard testimony regarding any potential inaccuracy, so any possible prejudice in that regard was negated. We conclude that the probative value of the photographs was not outweighed by the danger of unfair prejudice; therefore, the defendant is without relief on this issue.

The defendant's second argument regarding the photographs identified by Dr. McGee, Mr. Wakefield, and Mr. Garmon is that the witnesses did not properly authenticate the photographs because the photographs were of the victim in the morgue, and the witnesses did not see the victim in the morgue. Rule 901 of the Tennessee Rules of Evidence states as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." The methods of authentication or identification in Rule 901(b) are various and include testimony from a witness with knowledge that a matter is what it is claimed. In this case, the state asked the witnesses in question whether the photograph depicted the victim as they saw her at the crime scene, not whether the photograph depicted the victim as they saw her at the morgue. Therefore, the witnesses' testimony that the photographs were consistent with the victim's appearance at the crime scene was sufficient to authenticate the photographs as depicting the victim's appearance to them at the crime scene and was not improper testimony as the victim's appearance at the morgue, which was outside of their personal knowledge. The defendant's argument is without merit as to this issue.

*D. Lay Opinion Testimony*

The defendant argues that the trial court erred by admitting improper lay opinion testimony of Paula Hagood, the 911 dispatcher; and of Gary Garmon and Daniel Wakefield, Memphis Fire Department personnel, in violation of Tennessee Rule of Evidence 701(a).

Tennessee Rule of Evidence 701(a) provides:
If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704. However, when the jury can readily draw its own inferences on an ultimate issue based on easily related facts and common experience, unaided by opinion testimony, it is error for the court to admit the opinion testimony. *See Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn. 1987). A lay witness may express an opinion to describe his or her observations if that is the only way in which the witness can effectively communicate those observations to the jury. *State v. Brown*, 836 S.W.2d 530, 550 (Tenn. 1992). "When the admission or exclusion of opinion evidence is challenged on appeal, it is reviewable only for abuse of discretion." *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007).

The record shows that the parties had a bench conference on a separate issue during Paula Hagood's testimony. At that time, the state informed defense counsel that it expected Ms. Hagood to testify "[t]hat she notified the police department and ask[ed] the homicide squad or felony response to respond." Defense counsel did not lodge an objection at that time. Ms. Hagood's testimony resumed, and the state asked her why she went to her supervisor as a result of the defendant's 911 call. Defense counsel then objected to the relevancy of the question, and the state responded that the question went to the testimony they discussed during the bench conference. The court ruled for the state, and Ms. Hagood testified that she told her supervisor that "the call was very possibly a homicide" and that it was her "responsibility to let him know of any high-priority calls." Defense counsel did not object after her testimony.

In our view, the defendant has waived his argument regarding Ms. Hagood's allegedly improper testimony. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. *See State v. Schmeiderer*, 319 S.W.3d 607, 625 (Tenn. 2010) (citing *State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001)). Appellate relief is not required when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). The defendant had two opportunities to object to Ms. Hagood's testimony as improper lay opinion - during the bench conference and during her testimony - but he only objected to relevancy. His objection to the relevancy of the state's question - "And why did you go to your supervisor?" - was insufficient to preserve the issue for appeal, and thus, he has waived this argument. *See Alder*, 71 S.W.3d at 302.

The defendant argues that the trial court erred by admitting testimony from Gary Garmon, a paramedic, that a bruise on the victim's back "looked like a shoe print" and that bruises behind the victim's ears were "battle signs." Chief Daniel Wakefield also testified, over the defendant's objection, that the victim "looked like [she] had been assaulted" and that the bruise "to [him] would indicate trauma from like the toe of a shoe." The trial court noted

that neither witness could state definitively that the bruise was a shoe print and allowed the testimony, ruling under Tennessee Rule of Evidence 701 that the testimony was "based on the perception of a witness, and . . . helpful to a clear understanding of a witness'[s] testimony."

In *Brown*, the Tennessee Supreme Court held that a nurse's testimony that an injury "looked like a cigarette burn" was admissible, while a paramedic's testimony as to the cause of a victim's bruised face was inadmissible, but was harmless error. 836 S.W.2d at 550. In this case, Mr. Garmon's testimony as to the appearance of the bruise was more like the nurse's testimony in *Brown,* and Chief Wakefield's testimony was more like the paramedic's testimony because he identified a potential cause - trauma caused by a shoe - while Mr. Garmon merely stated that the bruise "looked like a shoe print." Therefore, we conclude that it was not error for the trial court to allow Mr. Garmon's lay opinion testimony. We conclude that it was not error to allow Chief Wakefield's testimony regarding the victim's overall appearance, but it was error to allow him to testify as to the cause of the bruise. However, that error was harmless in light of the record as a whole. Other witnesses testified that the bruise appeared to be a shoeprint, and the jury heard testimony from Agent Littlejohn that she could not state with scientific certainty that the bruise was caused by the defendant's shoes. As for Mr. Garmon's statement regarding "battle signs," the defendant has waived appellate review by not making a contemporaneous objection. *See Alder*, 71 S.W.3d at 302. The defendant is not entitled to relief on this issue.

### E. Further Objections to Rachel Songstad's Testimony

The defendant contends that the trial court's admission of Rachel Songstad's testimony violated the attorney-client privilege and the defendant's constitutional right to confront the witnesses against him.

The Tennessee Code Annotated defines the attorney-client privilege in section 23-3-105:

> No attorney, solicitor or counselor shall be permitted, in giving testimony against a client or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person during the pendency of the suit, before or afterward, to the person's injury.

"[T]he attorney-client privilege exists to protect the client and to foster full communication with the attorney. Because the privilege exists to protect the client, it belongs only to the client and thus may not be asserted by a third party." *State v. Tracy F. Leonard*, No. M2001-00368-CCA-R3CD, 2002 WL 1987963, *8 (Tenn. Crim. App., at Nashville, Aug.

28, 2002). Here, the defendant does not have standing to assert the victim's privilege, and his argument is without merit.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that testimonial out-of-court statements violate a defendant's rights under the Confrontation Clause and are only admissible when (1) the declarant/witness is unavailable and (2) the defendant has had a prior opportunity to cross-examine the declarant/witness. 541 U.S. at 68-69; *see also State v. Maclin*, 183 S.W.3d 335, 345 (Tenn. 2006), *abrogated by State v. Cannon*, 254 S.W.3d 287 (Tenn. 2008). In *Maclin*, the Tennessee Supreme Court held that the trial court should employ a case-by-case approach to inquire whether a challenged statement was made "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Maclin*, 183 S.W.3d at 349 (quoting *Crawford*, 541 U.S. at 52). The court provided an inexhaustive list of factors for courts to consider:

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

*Id.* at 349.

In *Davis v. Washington*, 547 U.S. 813 (2006), the United States Supreme Court refined the holding in *Crawford* by holding that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.

In *State v. Cannon*, 254 S.W.3d 287, 302 (Tenn. 2008), the Tennessee Supreme Court ruled that *Davis* abrogated its holding in *Maclin* "because the Court adopted a 'primary purpose test . . . requir[ing] courts to examine the context in which a statement is given.'" *State v. Franklin*, 308 S.W.3d 799, 814 (Tenn. 2010)*, cert. denied*, 131 S. Ct. 1598 (2011). The court adopted the primary purpose test for Tennessee, holding that "[s]tatements are testimonial if the primary purpose of the statement is to establish or to prove past events potentially relevant to later criminal prosecutions." *Cannon*, 254 S.W.3d at 303. In applying the primary purpose test to the facts of the case, the *Cannon* court held that, in an issue of first impression, statements made to a sexual assault nurse examiner were testimonial because of (1) the police department's procedure to have a sexual assault nurse examiner speak with a potential victim of sexual assault; (2) the nurse's training by law enforcement in questioning and collecting evidence; (3) the structured nature of the questioning and examination, described by the nurse as an investigation; and (4) the fact that there was no longer an ongoing emergency. *Id.* at 305. The court noted that the United States Supreme Court categorized a 911 dispatcher as an agent of law enforcement, but the court did not categorize the sexual assault nurse examiner as an agent and cautioned against using its holding as a "blanket rule" regarding all sexual assault nurse examiners, reasoning that there is a continuum between testimonial and non-testimonial statements, and that the trial courts should use "*in limine* procedures and redaction to balance appropriately an accused's right of confrontation against the prosecution's right to present admissible evidence." *Id.*

Recently, the Tennessee Supreme Court addressed whether statements made in "an exchange between two truly private parties" can ever be testimonial. *See Franklin*, 308 S.W.3d at 815. The court reasoned:

> Drawing from cases involving police interrogations, the law is clear that statements "'are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" To account for the absence of law enforcement in this case, we merely need to replace "interrogation" with "dialogue," "exchange," or a similarly neutral term. Conversely, the statement is nontestimonial if the primary purpose is something other than establishing or proving past events potentially relevant to prosecution, such as providing or enabling assistance to resolve an ongoing emergency. An objective standard, focusing on the perspective of a reasonable person, governs the determination of the statement's primary purpose.

*Id.* at 815-16 (internal citations omitted). The court stated that the inexhaustive list of factors from *Maclin* remained relevant for a court to consider when determining whether a statement

is testimonial but should not be used mechanically. *Id.* at 818. The court further stated that both the declarant's and the questioner's intent should be analyzed. *Id.* at 817-18.

In *Franklin*, the court considered whether a contractor's written statement bearing the license plate number of a robbery suspect's car was testimonial and concluded

> that the contractor was simply responding to a plea for help from a distressed individual in need of assistance. An employee from the business next door to his job site claimed that she was robbed and asked him to observe a tag number of a vehicle belonging to a man who was leaving the premises. In the heat of that moment, a reasonable person in the contractor's position would have had very little time to think. He was merely providing requested assistance. The fact that the tag number became relevant to a later prosecution does not automatically make the tag number "testimonial."

*Id.* at 819 (citing *U.S. v. Mendez*, 514 F.3d 1035, 1046 (10th Cir. 2008)). The court held that the statement was nontestimonial hearsay because "[t]he primary purpose was not to establish or prove past events of potential relevance to subsequent criminal prosecution." *Id.* at 822.

As in *Franklin*, this case involves an exchange between two private parties, an attorney and her client, the victim, who was also a friend. The trial court analyzed the defendant's Confrontation Clause argument under *Maclin*, the applicable law at the time. The trial court allowed the victim's statements to Ms. Songstad, finding that the declarant-victim did not make the statements with the belief that they would be used at a later trial; that the victim initiated contact; that there was no formality involved; that the victim gave the statements in response to unstructured questioning "and the scope of the questioning was trying to get her to open up and tell what was happening in her life;" that the statements were not recorded; that the victim's purpose in making the statements was "to confide in a friend;" and that Ms. Songstad did not contemplate using the statements at a trial.

The defendant now argues that under *Cannon*, the trial court's analysis fails and this court should find that the victim's statements to Ms. Songstad were testimonial hearsay in violation of the defendant's right to confront witnesses against him. However, it is clear that under *Franklin*, the trial court's analysis is sound. From both the victim's and the witness's perspective, reasonable people in their positions would not have contemplated that the primary purpose of the victim's statements was to establish or prove past events in a trial for her murder.[7] We conclude that the victim's statements to Ms. Songstad were nontestimonial

---

[7] The defendant argues that Ms. Songstad planned to obtain a restraining order against the defendant
(continued...)

-33-

hearsay and the admission of the statements did not violate the defendant's right under the Confrontation Clause.

### F. Motions for Mistrial/ to Strike Witness's Testimony

The defendant argues that the trial court abused its discretion by denying the defendant's two motions for mistrial, and in the alternative to strike Rachel Songstad's testimony. He contends that Ms. Songstad had an "agenda" and "blatantly disregarded the court's restrictions on her testimony." He further contends that the trial court's striking of portions of her testimony and its curative instruction were insufficient to avoid a miscarriage of justice.

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. *See id.*; *State v. Jones*, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold*, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981).

"The purpose of a motion to strike evidence is to exclude incompetent evidence from the record and consideration by the trier of fact." *State v. Melvin*, 913 S.W.2d 195, 200 (Tenn. Crim. App. 1995). The moving party may direct the motion to the exclusion of an item of evidence, part of a witness's testimony, or a witness's entire testimony. *Id.*

---

[7](...continued)
on the victim's behalf, and he reasons that because criminal contempt is one penalty for violation of a restraining order, that Ms. Songstad obtained the victim's statements to establish or prove past events relevant to a future criminal prosecution. However, no such restraining order was in place at the time, and indeed, the victim had not requested that Ms. Songstad seek one prior to her death. In any event, even if Ms. Songstad did consider whether she could use the victim's statements in a prosecution for a violation of a protective order, which the record does not support, it was not her primary purpose in eliciting the victim's statements.

In this case, the court instructed the state that it would allow Rachel Songstad to testify with the restriction that she was not to discuss the victim's fear of the defendant. However, when relating a conversation with the victim about an altercation the victim and the defendant had, Ms. Songstad testified that the victim was "scared at that point." The defendant moved for a mistrial, which the court denied. The court told the parties during a bench conference that it would remind Ms. Songstad of the restrictions on her testimony. Defense counsel requested that the court not use the term "restrictions" when addressing the witness in the hearing of the jury. The court told the witness, "I would like to remind you about what my previous rulings were about your testimony." The witness responded, "Okay. . . . Your Honor, may I know what - may I ask Your Honor what the restrictions are on my testimony?" The court asked the jury to step out of the courtroom and reminded the witness that she was not to discuss the victim's fear of the defendant because it was irrelevant in a first degree murder case. Defense counsel moved to strike Ms. Songstad's testimony because "it appear[ed] that she had an agenda" based on her use of the word "restrictions" after the parties agreed not to use that term. The witness said that she did not hear the parties' discussion during the bench conference. The court allowed Ms. Songstad's testimony to continue.

Later, Ms. Songstad testified that when the victim was describing how the defendant choked her, the victim "seemed fearful." The defendant moved for a mistrial, or in the alternative, to strike the witness's testimony. The court ruled "in light of the case law that says this is harmless error[,] that it doesn't rise to the level of a reversal . . . I don't know if a mistrial would be a proper sanction; however, I think a curative instruction to the jury to disregard the last statement would be in order." The court gave this instruction to the jury:

> Ladies and gentlemen, I'm going to direct you - order you to disregard the witness'[s] last statement to you; and I want to add to that, that fear is not an element of murder in the first degree.

> So, at this time, whether or not [the victim] was fearful at any time is irrelevant at this point in the trial. Okay. So, disregard that last statement.

In our view, there was no 'manifest necessity' to halt the proceedings and declare a mistrial. The jury had heard testimony from three other witnesses about the defendant's assaults on the victim and the victim's demeanor. Testimony that the victim was scared or seemed fearful would not be surprising. The trial court ordered the jury to disregard the witness's statements regarding fear. Jurors are presumed to follow the instructions of the court. *Reid*, 91 S.W.3d at 279. Clearly, there was an alternative to halting the proceedings; therefore, the trial court did not abuse its discretion by denying the motion for mistrial. As for the motion to strike the witness's testimony in its entirety, the remainder of the witness's

testimony was competent, relevant evidence, and the trial court properly determined that an instruction to the jury to disregard the witness's statements regarding fear was a sufficient remedy. The defendant is without relief as to this issue.

### G. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his conviction for second degree murder. He "concedes that the evidence tended to show that he committed certain assaultive acts" toward the victim, but he claims that the state did not prove beyond a reasonable doubt that he was reasonably certain that the assaultive acts would result in the victim's death and that he acted without adequate provocation to mitigate the offense to voluntary manslaughter.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude every other hypothesis except that of guilt. *See State v. Genaro Dorantes*, No. M2007-01918-SC-R11-CD, 2011 WL 208306, at *12 (Tenn. 2011) (adopting the United

States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

Second degree murder is "[a] knowing killing of another." *See* Tenn. Code Ann. § 39-13-210(a)(1). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997). "In second degree murder, the result of the conduct is the sole element of the offense. . . . [A] result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000).

Taken in the light most favorable to the state, the evidence supports the defendant's conviction. He admitted that he and the victim had a physical altercation the evening before her death, that he forced her to sleep in the garage, that he dragged her inside at some point in the night, and that he did not call Dr. McGee to check on the victim's health until noon the following day. The medical evidence revealed that the victim received multiple blows to her head, which caused her death. By its conviction, the jury rejected the testimony of the defendant's medical expert that the victim's injuries could be explained by alcoholic ketoacidosis. The defendant's admission and the medical evidence alone are sufficient to sustain the defendant's conviction for second degree murder.

The defendant claims that he had adequate provocation because he discovered messages on the victim's phone that she had sent to another man, but there is no proof that he discovered the messages that night. The analyst was unable to determine when the messages were sent, and there was testimony that the defendant had been aware of the victim's affair with Mr. Lowe for at least a year. The defendant is without relief for this issue.

*H. Sequential Jury Instructions*

The defendant claims that the acquittal-first jury instructions precluded the jury from considering all of the legal issues and misled the jury, violating his right to trial by jury.

Under the United States and Tennessee Constitutions, a defendant has a right to trial by jury. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). A defendant also has a right

to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *Id.* In evaluating claims of error in jury instructions, courts must remember that "'jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning.'" *State v. Vann*, 976 S.W.2d 93, 101 (quoting *Boyde v. California*, 494 U.S. 370, 380-381 (1990)). Therefore, we review each jury charge to determine if it fairly defined the legal issues involved and did not mislead the jury. *See State v. Hall*, 958 S.W.2d 679, 696 (Tenn. 1997).

The Tennessee Supreme Court has determined that acquittal-first jury instructions do not offend a defendant's right to trial by jury under the Tennessee Constitution. *See State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008). The *Davis* Court held that

> while a defendant is entitled by our constitution to have the jury charged on all offenses encompassed within the indictment and supported by the proof, our constitution does not go so far as to mandate the order in which those offenses are considered. Our constitution also does not prohibit the requirement that a jury first reach a unanimous verdict of acquittal with respect to a greater offense before it proceeds to consider a defendant's guilt of a lesser-included offense.

*Id.* The defendant, therefore, does not have any relief under the Tennessee Constitution, and he does not make any argument that the federal constitution requires a different result. Therefore, the defendant's argument is without merit.

*I. Sentencing*

The defendant argues that the trial court misapplied enhancement and mitigating factors.

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

As a Range I offender, the defendant was subject to a sentence of fifteen to twenty-five years for second degree murder, a Class A felony. Tenn. Code Ann. § 40-35-112(a)(1).

Following a sentencing hearing, the trial court sentenced the defendant to twenty-five years as a violent offender[8] in the Tennessee Department of Correction.

In its sentencing, the trial court found that the following enhancement factors, enumerated in Tennessee Code Annotated section 40-35-114, applied: (1) the defendant had a history of prior criminal behavior - based on the assault witnessed by Ms. Brown; (5) the defendant treated the victim with exceptional cruelty - based on the defendant's "allowing [the victim] to suffer and languish for hours without seeking help;" (6) the personal injuries inflicted on the victim were particularly great - based on the bruises that did not contribute to the victim's death; and (14) the defendant abused a position of trust - based on a finding that the defendant swore an oath to protect the victim as his wife. The court placed great weight on enhancement factor (5) and "a lot of weight" on factors (1) and (6).

The court discussed various mitigating factors, determining that it would not give any weight to the defendant's arguments that he acted under strong provocation or that substantial grounds existed to justify the offense. The court held that it had insufficient information to determine whether the circumstances were so unusual that it was unlikely that the defendant had a sustained intent to violate the law or whether the defendant "present[ed] a danger to commit future crimes." Regarding the defendant's lack of criminal record, the court said, "I guess I could render it some weight, but it certainly doesn't explain why somebody would just beat the living heck out of somebody and leave them to die." The court acknowledged that the defendant "perhaps" had the potential to contribute positively to society, that he had a stable work history, and that he was a college graduate, but declined to put any weight on those mitigating factors because "[the defendant] had the whole world in his hand[, and] he had the opportunity to correct whatever problem he had with his anger before the day that he beat [the victim] to death."

*Enhancement Factor (1).* The defendant contends that the trial court misapplied enhancement factor (1), arguing that the defendant's lack of criminal record rendered this factor inapplicable and that "a single uncharged act of assault should not constitute 'criminal behavior.'" However, the enhancement factor encompasses crimes for which a defendant has not been charged. *See State v. Carico*, 968 S.W.2d 280, 288 (Tenn. 1998). Domestic assault is a criminal offense in Tennessee. *See* Tenn. Code Ann. § 39-13-111. The trial court relied on one incident of domestic assault, but there was ample proof, by a preponderance of the evidence, in the testimony of Paul Dooley, Elizabeth Scism, and Rachel Songstad that the defendant committed other assaults against the victim. *See Carico*, 968 S.W.2d at 287 (discussing "federal and state decisions recogniz[ing] that the trial court may utilize criminal

---

[8] Tennessee Code Annotated section 40-35-501(i) provides that "[t]here shall be no release eligibility" for persons who commit the enumerated offenses, including second degree murder.

behavior shown by a preponderance of the evidence to enhance a sentence without violating federal or state due process."); *see also State v. Nelson Troglin*, No. E2001-00251-CCA-R3-CD, 2002 WL 385800, at *22 (Tenn. Crim. App., at Knoxville, March 12, 2002) (concluding that the trial court did not err in applying an enhancement factor for criminal behavior when there was proof that the defendant had shot at a witness in his trial). Therefore, even though the defendant was never charged with domestic assault, the trial court did not err by applying this enhancement factor to the defendant's sentence.

*Enhancement Factor (5)*. The defendant contends that the trial court erred by applying enhancement factor (5) because the finding that the defendant treated the victim with exceptional cruelty "was not supported by the evidence and the court relied on facts also used to prove the offense." The defendant argues that the jury took the defendant's failure to render aid into account in its conviction, and therefore, that same failure to render aid cannot be used to enhance his sentence.

In order to sustain application of the "exceptional cruelty" enhancement factor, there must be a finding of acts "separate and apart from the actions which constituted the offenses." *See State v. Poole*, 945 S.W.2d 93, 99 (Tenn. 1997). The facts of the case "must 'denote[ ] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged.'" *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Kelly Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App., at Jackson, Mar. 14, 2000).

This court has upheld the application of enhancement factor (5) in a second degree murder case where the facts showed that the victim had many internal and external injuries other than the skull fracture that led to her death. *State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). While the *Gray* court noted that factor (5) is most often found in cases of abuse or torture, the court found it "certainly applicable in this case given the traumatic and severe injuries sustained by the victim." *Id*. Subsequent panels of this court concluded, based on *Gray*, that exceptional cruelty is not an element of second degree murder. *See State v. Lonnie Lee Owens*, No. M2005-00362-CCA-R3-CD, 2005 WL 2653973, *5-6 (Tenn. Crim. App., at Nashville, Oct. 18, 2005), *State v. Mark A. Stacy*, No. E2000-02906-CCA-R3-CD, 2001 WL 487685, *7 (Tenn. Crim. App., at Knoxville, May 9, 2001); *see also State v. Edward Charles Tennial*, No. W2006-00999-CCA-R3-CD, 2007 WL 2935625, *5 (Tenn. Crim. App., at Jackson, October 9, 2007) (finding enhancement factor (5) applicable in first degree murder case when defendant stabbed victim eleven times, and one stab wound was the proximate cause of the victim's death). Additionally, the Tennessee Supreme Court has affirmed the application of enhancement factor (5) in a case involving

a delay in medical treatment when the defendants hit a victim with a baseball bat and left her alone, "unconscious and bleeding." *Poole*, 945 S.W.2d at 99.

In this case, the record supports the application of enhancement factor (5). The defendant admitted to having an altercation with the victim sometime on November 22, 2006. He did not call Dr. McGee until the afternoon of the following day and did not call 911 until 3:43 p.m. Meanwhile, according to the medical testimony, the hemorrhages in the victim's brain were expanding and her muscle cells were breaking down. We agree with the trial court that the defendant left the victim languishing for hours without seeking medical help and that this constituted exceptional cruelty, which is not an element of second degree murder. Contrary to the defendant's assertion that the jury considered his failure to render aid as an element in its conviction and that same failure to render aid cannot, therefore, be used to enhance his sentence, failure to render aid is not an element of second degree murder. *See* Tenn. Code Ann. § 39-13-210(a)(1). Therefore, the defendant is without a remedy for this issue.

*Enhancement Factor (6)*. The defendant argues that the trial court erred in its application of enhancement factor (6) - that the personal injuries inflicted on the victim were great - because the death of the victim was an element of the offense. We agree with the defendant that the application of this enhancement factor was error. The personal injuries inflicted in every homicide are "particularly great," and this factor is therefore an essential element of the offense such that it may not be applied to enhance the defendant's sentence. *See* Tenn. Code Ann. § 40-35-114; *State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995). Accordingly, the trial court should not have enhanced the defendant's sentence on this basis.

*Enhancement Factor (14)*. The defendant contends that the state did not prove that the defendant abused a position of private trust. In *State v. Kissinger*, 922 S.W.2d 482 (Tenn. 1996), the court articulated the standard for determining the existence of a position of trust solely in terms of the defendant and victim. The court gave the following description of the requisite position of trust:

> The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

*Kissinger*, 922 S.W.2d at 488.

-41-

In *State v. Gutierrez*, 5 S.W.3d 641 (Tenn. 1999), the supreme court considered whether there was an abuse of a position of trust when a defendant killed his live-in girlfriend. The court reasoned that relationships that promote confidence, reliability, or faith typically include a degree of vulnerability, and "[i]t is the exploitation of this vulnerability to achieve criminal purposes which is deemed more blameworthy and thus justifies application of the enhancement factor." *Gutierrez*, 5 S.W.3d at 646. The court further reasoned that using the mere existence of a relationship or the fact of cohabitation to justify this enhancement factor might "lead to unwarranted results" and "an overly-broad application of the enhancement factor." *Id*. at 645. Likewise, relying on a husband's marriage oath to protect his wife to justify the application of this enhancement factor, as the trial court in this case did, would lead to an overly-broad application and unwarranted results, allowing this enhancement factor to be applied in every case where a spouse commits a crime against his or her spouse.

The trial court's secondary justification was that the defendant put the victim in a vulnerable position by rendering her unconscious. We agree with the defendant that this was not the type of vulnerability described in *Gutierrez*. The issue is whether the *relationship* created the vulnerability, not whether the defendant's actions created the vulnerability. Here, the defendant and the victim were married, but the testimony at trial did not describe a marriage relationship that promoted confidence, reliability, and trust that created a vulnerability on behalf of the victim. As in *State v. Paul Graham*, "[i]n short, the evidence portrays the antithesis of a relationship based on confidence, reliability, or faith." *Graham*, No. M2003-00331-CCA-R3-CD, 2004 WL 741666, *14 (Tenn. Crim. App., at Jackson, April 7, 2004). We conclude that the state did not prove the existence of the type of relationship required to apply enhancement factor (14); therefore, it was error for the court to enhance the defendant's sentence on this basis.

*Mitigation Factors*. The defendant's contention that the trial court did not consider mitigation factors in this case is without merit. The trial court clearly considered many mitigating factors, such as the defendant's lack of criminal record and education, but placed little weight on such factors.

An error in the application of enhancement factors will not necessarily result in modification of the sentence if the trial court, in determining the specific sentence, considered the nature and characteristics of the crime, the character and background of the defendant, and the purposes of the Sentencing Act. *See* Tenn. Code Ann. § 40-35-210(b). Despite the trial court's reliance on two inapplicable enhancement factors, the record supports the court's consideration of the remaining two enhancement factors. The record reflects that in determining the specific sentence length, the trial court considered the

provisions of Tennessee Code Annotated section 40-35-210, as well as the required principles of sentencing. As such, we affirm the length of the sentences as imposed.

## Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE